

## TRESSLER, SODERSTROM, MALONEY & PRIESS

### ATTORNEYS AT LAW

744 Broad Street
Suite 1510
Newark, NJ 07102
973/848-2900
Fax 973/623-0405
www.tsmp.com

Mark Robert Vespole
(973) 848-2909
mvespole@tsmp.com
Certified Civil Trial Attorney

December 15, 2005

**<u>Via Telefax and Federal Express</u>**
The Hon. Joseph J. Farnan, Jr.
J. Caleb Boggs Federal Building
844 N. King Street
Room 4124
Wilmington, DE 19801

      Re: New England Life Insurance Company v. Anthony Alfieri, et al.
           Docket No. 05-cv-415

Dear Judge Farnan:

     Please accept this letter brief and argument on behalf of defendant Richard Hewitt as to why plaintiffs' petition to either hold defendant Hewitt in contempt for violation of the July 25, 2005 Consent Order in this matter should be denied based upon the November 29, 2005 hearing before you.

### <u>INTRODUCTION</u>

     On July 25, 2005, this Court entered a Consent Order, agreed upon by both parties pursuant to a Motion for Preliminary Injunction by the Plaintiffs. The Consent Order states in pertinent part, as follows:

> Commencing on the date of this Order and continuing until two years from the dates the defendants terminated their respective relationships with plaintiffs, the defendants shall not, directly or indirectly, contact the policyholders of the plaintiffs who own policies for which the defendants are the agent of record, for the purpose of inducing any such policyholders to lapse, cancel, fail to renew or replace any policy.

     See July 25, 2005 Consent Order, Paragraph 1. The Plaintiffs must prove on this application that: 1) defendant contacted a New England Financial policyholder; 2) defendant is the agent of record for that policy and 3) defendant sought to induce the policyholder to lapse, cancel, fail to renew or replace a New England policy.

---

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 2


First, as you have requested, we will provide our thoughts and legal arguments about the standard of proof that should be applied in the context of an injunction sought based upon a consent order.

## STANDARD OF REVIEW

The court should apply the clear and convincing evidence standard to this motion to enforce the terms of the consent decree. The legal standard and burden of proof for injunctive relief and for breach of a court order are different. Courts evaluate whether to issue permanent injunctive relief under the preponderance of the evidence standard – whether the party seeking an injunction has actually prevailed on the merits. *A.C.L.U. of New Jersey v. Black Horse Pike*, 84 F.3d 1471, 1477 n.3 (3rd Cir. 1996) (citing *CIBA-GEIGY Corp. v. Bolar Pharmaceutical Co.*, 747 F.2d 844 (3rd Cir. 1984)); *Shred-It Usa, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp.2d 228, 233 (S.D.N.Y. 2002) (citing *Addington v. Texas*, 441 U.S. 418, 423 (1979)). In contrast, courts evaluate alleged breaches of an already existing injunction or court order under the clear and convincing evidence standard, determining whether the defendant violated an unambiguous provision of the consent decree. *See Harris v. City of Philadelphia*, 47 F.3d 1333, 1340 (3rd Cir. 1995) ("*Harris I*").

Broadly, most requests for injunctive relief to enforce a pre-existing consent decree are inconsistent, because a consent decree is already an enforceable court order. *See Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (citing *Harris I*, 47 F.3d at 1340) (explaining that a consent decree is an equitable order subject to equitable remedies when breached, although not addressing the burden of proof on the issue of breach). Stated differently, a consent decree *is* an injunction – albeit an injunction to which both parties willingly submit. *Id*. A party might supplement or clarify a pre-existing order by seeking a second injunction – the consent order here affirms the parties right to do so. *See United States v. Microsoft Corp.*, 147 F.3d 935, 941-44 (D.C. Cir. 1998). Yet, unless the motion purports to clarify the consent decree, then a motion such as plaintiffs seek here seemingly asks the court to issue an injunction against breaching an injunction. That formulation appears redundant

Two circuits – although not the Third Circuit – have addressed the situation and resolved the inconsistency. The Eleventh Circuit, in *Reynolds v. Roberts*, 207 F.3d 1288, 1298-99 (11th Cir. 2000), held that a court may only enforce a consent decree through its contempt power – seeking an injunction is erroneous. In *Reynolds*, defendant had clearly not violated the consent decree. *Id.* at 1299. Therefore, any contempt citation was doomed to failure under the terms of the consent decree, and plaintiff's supposed motion for an injunction was just a thinly disguised attempt to modify those terms. *Id.* The court rejected the motion, chastising the plaintiff for claiming to seek "injunctive " relief when it should have sought a finding of contempt. *Id.*

The District of Columbia Circuit took a similar but less absolute approach in *United States v. Microsoft Corp.*, 147 F.3d 935, 941-42 (D.C. Cir. 1998). In that case, the government

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 3

pressed a contempt citation and a request for injunctive relief. The court rejected the contempt citation. *Id.* at 941. However, the court analyzed the purported request for an injunction, transmuting the motion into a request for clarification of the terms of the consent decree. *Id.* at 942-42. In essence, the court concluded that the government had moved: (1) first for a contempt citation for Microsoft's violation of the decree and; (2) in the alternative, declaratory relief stating that certain conduct by Microsoft would violate the decree in the future. *Id.* That was appropriate – a court may clarify whether certain conduct falls within the prohibitions of a consent decree, so long as the court does not actually modify the decree. *Id.* But that issue is separate from the first issue: whether the party engaged in unambiguously prohibited conduct. *Id.* at 941-42.

Accordingly, a party cannot plausibly seek an injunction to enforce the terms of a consent decree through sanctions. At worst, a motion for injunctive relief seeks to improperly subvert and modify the decree (as in *Reynolds*); at best, such a motion seeks clarification of ambiguity (as in *Microsoft*). In the latter case, the court simply supplements its order – it does not afford sanctions or relief unless the party proves a violation of the order.

Plaintiff's motion falls within the framework of the Microsoft decision. The key issue here is what relief the plaintiff seeks – a clarifying injunction or remedies for breach of a court order, i.e. the consent decree. Plaintiff's motion, through couched in terms of injunctive relief, actually seeks to show breach of a pre-existing consent order. (See Pl's. Pet. for Perlim. Inj. at 3.) Regardless of its caption, plaintiff's motion does not seek mere injunctive relief. Rather, it seeks: (1) an injunction *barring any contact whatsoever* with former clients; and (2) sanctions and attorney fees for breach of the pre-existing consent decree. (See also Transcript p. 79, lls. 8-10). The first request goes beyond the original decree, which barred contact for the purpose of replacing policies and products. The first request therefore presupposes a breach of the consent decree – otherwise the plaintiff would have no grounds to modify the decree. The second request seeks sanctions, properly obtained through contempt proceedings and also presupposing a breach of the consent decree. Therefore, the court should apply the standard for breach of a consent decree

That standard requires that plaintiff prove, by clear and convincing evidence, that defendant violated the clear terms of a court order. To determine whether a party has violated a consent decree, the court should first interpret the decree under the ordinary principles of contract interpretation, looking first to the terms of the decree itself, then extrinsic aids to resolve ambiguity. *See, e.g., United States v. State of New Jersey,* 194 F.3d 426 (3rd Cir. 1999). The court should then decide whether the evidence clearly and convincingly establishes the violation of an unambiguous portion of the decree. *Harris I,* 47 F.3d at 1340. Here, plaintiff has failed to carry its burden of proof and failed to meet the legal standard for violation of a consent decree.

Prior to the *Harris* decisions, this court had suggested that alleged violations of a consent decree are evaluated under a preponderance of the evidence burden of proof. *See Coca-Cola*

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 4

*Bottling Co. v. Coca-Cola Co.,* 769 F. Supp. 599, 658-59 (D. Del. 1991). In that decision, this court followed the Harris standard for violations of a consent decree: construe the language then decide whether the evidence proves a breach of unambiguous language. However, the evidence in that case did not even meet the lower threshold of preponderance of the evidence. *Id.* Therefore, this court had neither the opportunity nor the need to evaluate whether a higher burden of proof might be appropriate. *Harris* later makes clear that the clear and convincing evidence burden of proof applies when a party seeks to prove breach of a decree.

Ultimately, plaintiffs' motion betrays its true character when it seeks sanctions and attorney fees. Simply put, this motion seeks sanctions and relief for breach of a consent decree, not a clarifying injunction.[1] Accordingly, plaintiff must prevail under the standard for violations of consent decrees, not the standard for injunctive relief.

Regardless of the potential procedural deficiencies of the Consent Order, and irrespective of whether plaintiffs' burden of proof on its petition is the "clear and convincing" or "preponderance of the evidence" standard, at their very best, based upon the testimony and documents presented at the November 29, 2005 hearing, the facts remain in equipoise as to whether Richard Hewitt violated the Consent Order. Consequently, plaintiffs' have not met their burden, and their petition must be denied.

## **HELEN JEAN HEWITT**

First of all, it is curious that plaintiffs chose to call only Helen Hewitt as a witness at the November 29, 2005 hearing, and not Arthur Hewitt, particularly since Richard Hewitt and Arthur Hewitt had conversations in which Helen Hewitt did not participate. (Tr. page 28, lines 7 to 16). According to testimony, Helen Hewitt had 2 New England contracts, an IRA and a $25,000 whole life policy. Arthur Hewitt had three New England contracts, a $25,000 whole life policy, an IRA which was invested in a New England variable annuity and a $50,000 variable life insurance policy. The three New England life insurance policies owned by the Hewitts were sold to them by a former New England agent, Peter Olsey. (Tr. page 2, lines 18 to page 3, line 1). According to Helen Hewitt, the purpose of the August 24, 2005 meeting was "to go over our accounts with us and show us what he had done and what he was doing, and what he projected was going to happen with our accounts." (Tr., page 4, lines 5-9) . According to Helen Hewitt, "We were talking about maybe doing something else..." when Richard Hewitt purportedly "suggested maybe we should liquidate or get the equity from all our different policies and put it in an IRA." (Tr. page 4, lines 12-15).

---

[1] Of course, if plaintiff's motion can be construed as a request for a clarifying injunction (as in *Microsoft*), then sanctions are wholly inappropriate. By definition, the court's clarification presupposes that the consent order did not <u>unambiguously</u> prohibit the conduct at issue.

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 5

Helen Hewitt recalled that she and her husband had met with Richard Hewitt on an annual basis to rebalance some of the investments in their various accounts of policies. (Tr. page 6, line 15 to page 7, line 4). Helen Hewitt did not understand what rebalancing the investments meant, although Richard Hewitt tried to explain it to her and her husband. (Tr. page 10, lines 8-19). Helen Hewitt recalled that Richard Hewitt spoke to her and her husband about the performance of various funds in which they were invested, but did not recall how the investment funds performed. (Tr. page 11, lines 1-13).

Helen Hewitt also testified that she and her husband may have had a discussion about the cost of their three New England life insurance policies prior to their August 24, 2005 meeting with Richard Hewitt. (Tr. page 23, lines 8-17). At that time, Helen and Arthur Hewitt were spending approximately $231 per month for life insurance. (Tr. page 12, lines 18-22). The Hewitts' combined annual income was approximately 40,000 to $45,000. ( Tr. page 22, lines 7-15 & page 42, lines 14-17). Prior to the August 24, 2005 meeting, Helen and Arthur Hewitt did have private conversations in which they discussed using the $231 of monthly life insurance premiums for something other than life insurance. (Tr. page 13, line 21 to page 14, line 24). Helen Hewitt never had a conversation with Richard Hewitt on August 24, 2005 about replacing New England life insurance policies. (Tr. page 19, lines 8-21 & page 23, line 22 to page 24, line 5). On October 13, 2005, through New England agent James Veit (who submitted an affidavit in support of plaintiffs' petition), Helen and Arthur Hewitt replaced their New England life insurance policies, but she does not recall what type of policies were used for the replacement. (Tr. page 18, line 14 to page 19, line 7 & page 19, line 22 to page 20, line 23).

Perhaps the most instructive testimony from the hearing is Mrs. Hewitt's response to the Court's question about why the Court was hearing testimony on November 29, 2005:

> THE COURT: So tell me in your words why you think I'm sitting here listening to this for?
>
> THE WITNESS: Because Mr. Hewitt signed an agreement saying that if he left the company he was with that he wouldn't contact any prior clients. And then on the 25th there was an injunction and he wasn't supposed to contact us after that. And so they called us and asked us if he had and we said yes, he had. He contacted us several times since that time. And that's what we're here for.

(Tr. Page 24, lines 12-23).

It is clear from this response that either plaintiffs or their counsel improperly and/or inaccurately advised Helen Hewitt that it was a violation of both the Consent Order and a New England contract for Richard Hewitt to have even any contact whatsoever with any clients who were New England policyholders, apparently regardless of whether or not Mr. Hewitt's purpose was to induce the lapse, cancellation, failure to renew or replacement of any New England

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 6

policy. As a result of Helen Hewitt's misperception that Richard Hewitt was violating not only his New England contract, but also the July 25, 2005 Consent Order by simply contacting her and her husband without more, she was clearly predisposed to believe that Richard Hewitt had done something wrong. Indeed, if the proper criteria for violation set forth in either the contract or the Consent Order was that any contact by Richard Hewitt with New England clients was prohibited, this Court could have easily decided plaintiffs' petition as soon as Mr. Hewitt submitted his November 16, 2005 affidavit in which he acknowledged contacting Arthur and Jean Hewitt after leaving New England in April 2004.

Perhaps as a consequence of Helen Hewitt's poisoned point of view regarding Richard Hewitt as a result of misinformation from plaintiffs, or simply because of her inability to accurately recall and relate events, it was perhaps not surprising that in further response to the Court's inquiry, Helen Hewitt did not remember ever requesting Richard Hewitt to work with her and her husband after he left New England:

> THE COURT: He [Richard Hewitt] says that at your request he continued that after he left New England Life. Did you make that request of Mr. Hewitt to continue to help you out?

> THE WITNESS: No. I don't ever remember doing that.

> THE COURT: So your understanding is that he contacted you and you never requested him to continue helping you?

> THE WITNESS: He would contact us and make an appointment and he would show us what he had to show us and that was it.

(Tr. Page 26, lines 7-18).

Clearly, Helen Hewitt's testimony is hopelessly irreconcilable with defendant's exhibits D-2 and D-3 from the November 29, 2005 hearing. In D-2, Arthur Hewitt gave specific written instructions to New England to release policy information to Richard Hewitt regarding Arthur Hewitt's New England variable annuity contract. In D-3, Helen Hewitt gave specific written instructions authorizing a change of broker-dealer from plaintiff, New England Securities, to Richard Hewitt's new broker-dealer, Hornor Townsend & Kent, Inc., for the NVEST Funds in her IRA account. Indeed, according to exhibit D-4, plaintiffs even acknowledged in writing to Richard Hewitt on August 23, 2004 the rebalancing of subaccounts which Mr. Hewitt undertook with Arthur and Jean Hewitt after their July 26, 2004 meeting. Curiously, D-4, which is plaintiffs' own confirmation statement of the rebalancing done in Mr. Hewitt's New England

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 7

variable annuity, Richard Hewitt is listed by New England as Arthur Hewitt's adviser, 4 months after Richard Hewitt left New England in April, 2004.

## RICHARD HEWITT

Richard Hewitt has been in the life insurance, securities and retirement planning business for more than 20 years, having worked for plaintiffs from October, 1984 to April, 2004 and at Penn Mutual since April, 2004. (Tr. page 30-1 to 31-9). Sometime in approximately 2000, Richard Hewitt was assigned by his New England manager at that time, Dick Rockwell, the financial information for Helen and Arthur Hewitt, because they had no New England representative assigned to them. (Tr. page 31, line 10 to page 32, line 7). Richard Hewitt initially met with Helen and Arthur Hewitt in February, 2002 and again sometime in 2003 while he was still affiliated with New England. (Tr. page 32, line 12 to page 34, line 3). The only product Richard Hewitt ever sold to Helen and Arthur Hewitt was an IRA sold to Arthur Hewitt in May, 2004 for which he earned approximately $200 in commissions. (Tr. page 34, line 18 to page 36, line 3).

Subsequent to his departure from New England in April, 2004, Richard Hewitt first contacted Helen and Arthur Hewitt to set up an annual review meeting, which took place on July 24, 2004 for the purpose of rebalancing the investments in some of their accounts, as he did with all of his clients. (Tr. page 36, line 20 to page 37, line 21 & page 38, line 13 to page 39, line 2). Richard Hewitt advised Helen and Arthur Hewitt of his departure from New England before the July 26, 2004 meeting. (Tr. page 37, line 22 to page 38, line 11). As part of his annual review with Helen and Arthur Hewitt on July 26, 2004, Richard Hewitt discussed the potential future offsetting of their $25,000 New England whole life policies, so that no further premium payments would have to be made and the premium dollars could be put into a Roth IRA. These discussions took place at the annual meetings in 2002, 2003, 2004 & 2005. (Tr. page 39, line 16 to page 40, line 8 & page 41, line 14 to page 42, line 4). At the July 26, 2004 meeting, Helen and Arthur Hewitt executed defendants exhibits 2 & 3 (from the 11/29/05 hearing) unequivocally indicating their interest in having Richard Hewitt continue to be involved with their accounts. Helen and Arthur Hewitt never told Richard Hewitt that they did not want his help in rebalancing their accounts on an annual basis, but if they had expressed that, Richard Hewitt would not have continued to contact them. (Tr. page 42, line 18 to page 45, line 9). Defendant's exhibit 1 is a written record of Richard Hewitt's July 26, 2004 meeting with Helen and Arthur Hewitt and is consistent with Richard Hewitt's testimony at the hearing.

Sometime in August 2005, Richard Hewitt called and spoke to Arthur Hewitt to set up the fourth consecutive annual review, rebalancing and update meeting for August 24, 2005. (Tr. page 48, line 18 to page 49, line 6). As he had in the past, Richard Hewitt drove one-hour South to Camden, Delaware, for no compensation or commissions, to conduct his annual review with Helen and Arthur Hewitt. (Tr. page 49, line 14 to page 50, line 19). Indeed, by virtue of Helen

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 8

Hewitt's execution of defendant's exhibit 3, Richard Hewitt was her registered representative for the purpose of her IRA account.

At the August 24, 2005 meeting, Richard Hewitt and Helen and Arthur Hewitt had a discussion about the two New England $25,000 graded premium/whole life policies because Helen Hewitt had indicated that she was more concerned about retirement planning than life insurance, and they had other life insurance elsewhere. (Tr. page 52, line 8 to page 53, line 20). Specifically, Richard Hewitt never suggested to Helen and Arthur Hewitt at the August 24, 2005 meeting that they surrender their New England life insurance policies, but instead Helen and Arthur Hewitt brought up the idea of taking the value of their life insurance policies and doing something else with it. (Tr. page 53, line 21 to page 54, line 7). Further, despite Helen and Arthur Hewitt's expression of interest in doing something else with the cash values of their life insurance policies, Richard Hewitt did not engage in any discussions about how he would be involved in the liquidation of any New England life insurance policies because of the very July 25, 2005 Consent Order in this case, but instead told them that if they wanted to surrender their New England policies, they would have to contact an agent from Creative Financial or New England. (Tr. page 54, line 17 to page 56, line 15). Richard Hewitt did not bring any illustrations with him to the August 24, 2005 meeting for replacement Helen and Arthur Hewitt's life insurance policies, did not take an application for any replacement policy or contract, and in fact never had any intent to replace any New England life insurance policy. (Tr. page 54, lines 8-16 & page 74, line 12 to page 75, line 14). Richard Hewitt was left with the impression that Helen and Arthur Hewitt would in fact be surrendering their New England policies to an agent at New England or its local agency, Creative Financial. (Tr. page 55, lines 16-19). Richard Hewitt's impression regarding the intentions of Helen and Arthur Hewitt to surrender their New England policies to a New England agent turned out to be prescient, inasmuch as 6-7 weeks later, on or about October 13, 2005, Helen and Arthur Hewitt apparently did replace their New England policies with New England's agent, James Veit, without even advising Richard Hewitt. (Tr. page 55, line 20 to page 56, line 3).

## LEGAL ARGUMENT

It has been suggested by plaintiffs' counsel that as between defendant Richard Hewitt and New England policyholder Helen Hewitt, someone must be lying, and that Helen Hewitt has no apparent reason to lie. However, the issue of credibility is not typically resolved by concluding that one of two parties with arguably diametrically opposed testimony is not telling the truth. Instead, credibility is most frequently determined by the ability of witnesses to observe, remember and relate historical events and bias or prejudice that a witness may have.

A witness can lose credibility in many ways. *See, e.g, Pharmacia Corp. v. Alcon Laboratories, Inc.,* 201 F. Supp.2d 335, 339 n.1 (D.N.J. 2002). Most fundamentally, though, witness credibility erodes when the witness' memory and general, ability to recollect the details at issue, or ability to perceive those details proves faulty. *See, e.g., Id*; *United States v. Corley,*

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 9

348 F. Supp.2d 970, 978 (N.D.Ind. 2004) (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). After all, faulty memory or perception undermines the basic rationale for witness testimony – personal knowledge of the underlying facts. *See generally* C.J.S. *Witnesses* § 565 ("The knowledge and recollection of the witness are basic to his or her credibility"). A witness demonstrates faulty memory, recall, or perception when he or she either cannot give details about the relevant events or gives details that are demonstrably incorrect or inconsistent. *See E.I. Dupont De Nemours And Co. v. Monsanto Co.,* 903 F. Supp. 680, 748 n.83 (D. Del. 1995); *Johnson & Johnson v. W.L. Gore & Assoc.,* 436 F. Supp. 704, 711-12 (D. Del. 1977). However, the amount of time passed since the relevant events can minimize impeachment value of faulty recollection. *Id.*

Two patent cases from this District illustrate these principles. *E.I. Dupont De Nemours And Co. v. Monsanto Co.,* 903 F. Supp. 680, 748 n.83 (D. Del. 1995); *Johnson & Johnson v. W.L. Gore & Assoc.,* 436 F. Supp. 704 (D. Del. 1977). Both cases involved the same legal issue: whether the alleged patent infringer actually invented the patented invention before the patent-holder. Prior invention invalidates a patent, and so the alleged infringer tried to prove prior invention to defeat the patent-holder's case. *DuPont,* 903 F. Supp. at 744. Proof of prior invention usually turns on both documents and witness testimony about past experiments, reports, discussions, etc. *See Id.* at 744-48. In the more recent case, *DuPont,* the alleged infringer, offered testimony from one of its researchers. *Id.* at 748 n.83. The researcher claimed to have invented the patent in two experiments five years before. *Id.* Yet, in his earlier deposition, the researcher had not provided even rough dates for these experiments – he only provided dates at trial and even then could only recall the months in which the experiments had supposedly taken place. *Id.* That testimony showed flawed memory and the court found the testimony not credible. *Id.* In the earlier case, *Johnson & Johnson,* the court found the alleged infringer's witnesses credible. *Johnson & Johnson,* 436 F. Supp. at 710-11. Those three witnesses testified that, at a meeting at offices of the 3M Corporation in St. Paul Minnesota, on or about January 25, 1957 (twenty years before the trial), the three attended a meeting during which the participants outlined their plans for the patented process at issue – using a substance called UTPFE tape as a pipe sealant. *Id.* The witnesses disagreed on minor details – whether they discussed the new use of the tape on the plane ride to St. Paul and whether the participants met to discuss other matters besides the tape. *Id.* at 712. The court dismissed those discrepancies because of the amount of time that had passed, and found the testimony credible. *Id.*

From outside this district, the Fourth Circuit decision in *Miller v. Mercy Hosp., Inc.,* 720 F.2d 356 (4th Cir. 1983) gives an example of how a witness faulty recall and reduced credibility can become apparent when documents the witness refers to, or has read or signed, contradict the witness' testimony. That is the case here, where documents signed by Mrs. Hewiit contradict her testimony. *Miller* was a Title VII employment discrimination case, so the court's decision hinged on testimony about what was said among the parties and when. *Id.* at 364. As the court

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 10

put it, the case centered on what was "intended, understood, and communicated" about Mercy Hospitals' rejection of plaintiff Miller's application for nursing position. *Id.* The Hospital had rejected Miller because of a negative reference from her former employer. *Id.* at 363. However, that negative reference resulted from racial bias – the former employer thought Miller was a "racial troublemaker". *Id.* Miller sought to prove that Mercy Hospital's staff knew the true nature of the prior negative reference and rejected Miller because they too thought she was a racial troublemaker. The court found Miller not credible for several reasons, two of which pertain to this motion. *Id.* at 366-67. First, Miller testified that she brought Mercy Hospital a letter of findings from the Equal Employment Opportunity Commission, stating that the prior reference arose from racial discrimination. *Id.* Yet Miller claimed to have done so on November 26, 1976, when in fact the letter was dated December 29, 1976. *Id.* Similarly Miller stated that he she had told the Mercy Hospital interviewer that racial discrimination had forced her to resign from her previous work. *Id.* at 367. However, on the same day as that interview, Miller had completed and signed an application form stating that her reason for leaving previous work was pregnancy. *Id.* Based on these contradictions between Miller's memory and documents she had reviewed (one of which she even put into evidence), the court could not credit Miller's testimony that she fully apprised Mercy Hospital of her prior employer's discrimination when Miller said she did. *Id.*

Prompting or coaching of a witness also undermines the claim that the witness has testified from its own unclouded memory. Here, the allegation that Richard Hewitt had breached a court order did not occur to Helen Hewitt until plaintiffs' representative contacted her. Witness preparation is not inappropriate, of course – but it can rise to a level where the witness own version of the facts loses credibility. For example, in *In Re Wagner*, 241 B.R. 112 (E.D. Pa. 1999), the court had enjoined a bankruptcy petition preparer from holding himself out as a lawyer, including giving advice to persons filing bankruptcy. *Id.* at 115. The preparer breached that injunction by not only filling out paperwork, but deciding which assets to declare on which Schedules of the debtors' bankruptcy filings. *Id.* at 116-17. That analysis was legal practice. *Id.* at 117. In his defense, the preparer called one of the debtors he had worked with, who constantly repeated that he only did the paperwork and did not give advice. *Id.* The court found that the preparer had simply instructed her to say this, because the debtor could not have decided what assets to declare on which Schedules without assistance. *Id.* The apparent coaching undermined her credibility. *Id.* Another example comes from *Poultry Processing v. Old Orchard Ocean Pier,* 780 F. Supp. 846 (Me. 1991), in which defendants tried to rescind the results of a foreclosure sale, alleging fraud because the mortgagee colluded with a leasing company to rig the sale. *Id.* at 850. However, the defendant's witnesses were not credible. *Id.* at 854. In particular, one witness, Ms. Petit, could not recall whether she had actually seen a meeting in a restaurant between the mortgagee's executives and the leasing company's executives, or whether she had simply heard about it from a third-party after the fact. *Id.* That contradictory testimony and the possibility that she actually had been led by someone else undermined her credibility. *Id.*

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 11

Finally, the court in *Tiggett v. New Jersey National Guard*, 1993 WL 5184, at *2 (E.D. Pa. Jan. 8, 1993), another Title VII case, explained the effect of faulty recollection when the plaintiff carries the burden of proof. In that case, the court stated that every witness – for plaintiff and defense – demonstrated serious gaps in memory and therefore none of them were particularly credible. *Id.* However, because plaintiff bore the burden of proof, defendant had to prevail. *Id.*

## CONCLUSION

Despite Helen Hewitt's pre-determination based upon misinformation from plaintiffs that Richard Hewitt violated both the July 25, 2005 Consent Order and his New England agent's contract by simply contacting her and her husband subsequent to his April, 2004 departure from New England, it should be clear that what actually took place here conforms more closely to Richard Hewitt's well-documented recollection of his relationship with Helen and Arthur Hewitt. Richard Hewitt's post-New England contact with Helen and Arthur Hewitt for annual review and rebalancing was part of a customary service which Richard Hewitt uniformly provided to all of his clients, regardless of the fact that he derived no financial benefit from the meetings. Indeed, contrary to Helen Hewitt's erroneous recollection, Helen and Arthur Hewitt agreed in writing to have a continuing and ongoing relationship with Richard Hewitt as their financial adviser. Consequently, it was perfectly appropriate for Richard Hewitt to contact Arthur Hewitt in August, 2005 for the purpose of setting up the fourth in a series of consecutive annual review and rebalancing meetings, and Richard Hewitt had every reason to believe he was providing a valuable service to Helen and Arthur Hewitt, which they valued as well.

It makes little sense that eight months short of the expiration of the two-year nonsolicitation provision of his contract, less than 30 days after the execution of the July 25, 2005 Consent Order and with no apparent financial incentive, Richard Hewitt would recommend, at least purportedly to Helen Hewitt, that she and her husband surrender their New England life insurance policies, with absolutely no discussion whatsoever of any replacement policy or contract. What does appear to make sense, at the end of the day, is that the issue of surrendering the New England policies was discussed, and because of the restrictions imposed upon him by his contract and the Consent Order, Richard Hewitt advised his clients that if they were interested in surrendering their New England policies, Helen and Arthur Hewitt would have to contact New England directly. Lo and behold, by October 13, 2005, New England's own agent orchestrated an internal replacement of Helen and Arthur Hewitt's three New England life insurance policies, while simultaneously "badmouthing" Richard Hewitt (who indisputably never recommended replacement to Helen and Arthur Hewitt) for purportedly violating his contract and the Consent Order merely by the act of contacting his clients. The eternal irony here is that plaintiffs' counsel stood before the Court in June, 2005 and represented that this case was all about "replacements". Apparently, that position has shifted to a different approach.

{99999.TDUDL / W0028822}

The Hon. Joseph J. Farnan, Jr.
December 15, 2005
Page 12


By any standard of proof, New England has utterly failed to establish that Richard Hewitt violated the consent order, or that the testimony and documents of Helen Hewitt are more credible than the testimony and documents submitted on behalf of Richard Hewitt. Consequently, plaintiffs' application must be denied.

Respectfully submitted,

/s/ *Mark Robert Vespole*

MARK ROBERT VESPOLE


MRV:sas
cc:     Paul Bucco, Esq.
        Wayne Marvel, Esq.

Newark-#16718